The next case is Belfiore v. Procter & Gamble. Well, you've had a preview. Good morning, Your Honors. May it please the Court. Mark Mosier on behalf of Procter & Gamble. Judge Calabresi, I'd like to start with the statement you made that this seems like a good case for class actions. And I want to be very clear about what our position is. We are not asking the Court to adopt any rule that would preclude a class certification in a class action like this, or to categorically hold that hedonic regression analysis could never establish a price premium. What we really think we're dealing with here, and what the fundamental error here, is the absence of evidence in this record to support that determination. And the Court suggested, you know, if we go right back to the experts and the proof of injury, that maybe Judge Weinstein implicitly resolved this issue. You know, we're not relying on the absence of the mechanical incantations. What kind of evidence do you need in a case where there isn't a comparator, so that it is not one kind of egg or another kind of egg, where you don't have that, and where you have evidence that this is a desirable attribute? What kind of evidence at this stage, as against weight and belief and the merits, do you want from an expert to say that would justify that being there? And what is not enough? That's really the issue. We think it's important, as you heard in the last argument, that the model be run, because I think what's really missing here, you know, if you look at what they're saying is the price paid at retail was inflated because of this representation. But what the evidence shows is that the retailer sets the price at its discretion, and we have no evidence of how or why. And, you know, when they talk about perhaps this regression analysis, well, if it fails, it's going to fail for the entire class, so it's a common question. But there's no reason to know that's the case. You can imagine a situation where perhaps some retailers charge a price premium, some retailers don't, and then it's an individualized question, and the model... Why would that happen in a market? I mean, if we are talking about market theory, if some retailers charge more because this is valuable, then you would expect that within a short period of time other retailers would charge more too. I mean, what is it that would cause some individuals to do it and not others, if this is a common attribute? I mean, again, I'm trying to think in terms of basic economic theory of why anybody would get away with charging more if it isn't a good attribute and why others would not charge more if somebody could get away with it. There's no reason to think under basic economic theory that the pricing model used by a corner store in Manhattan that maybe has two or three products for sale in a target superstore in upstate New York that sells everything, that they're going to price them the same way. And so there's going to be individualized issues at every state for the causation. It's not price in the same way, but the same pressure in terms of this attribute would be in common, and that would be a common issue. Now, it might be that some people have greater damages and some people have less, but there would be a common attribute of a more valuable thing. It either is there or is not. I'm talking about premium, not price. Right, but, you know, our expert testified, and I think this is sort of what's going on in both side practices, that a desirable attribute may not lead to a higher price. That is right. A desirable attribute may not lead to a higher price, and you have the other expert saying that this desirable attribute does, and he will be able to show it. And the question is whether at the class certification stage that, together with the fact that this is a desirable attribute and various comments about it, is enough. That's the thing that, you know. Your Honor, the expert very much did not say that this attribute leads to a higher price. He has not done the calculation. He cannot express any opinion on that. And our experts say he's expressed a willingness to try to show that. Our experts have shown that's going to be difficult and may not be possible. No one is saying hedonic regression analysis always fails, and even their side doesn't say it always succeeds. It really, and if you get into how the model operates, what Weir says, it's an iterative process, and you have to get the data. You've got to make sure you've got sufficient data. You've got to run the model. You've got to iterate, and it can fail. And we don't know whether it's going to succeed or fail until he runs it. And this, you know, taking it a step farther, if you look at, compare this to the economic models of price premium in both Zyprexa and in McLaughlin, there you had a calculation of a price premium, and the court said we're still going to scrutinize that to see if what's underlying these conclusions are actually showing price premium and doing so on a class-wide basis, or whether this economic analysis is masking individualized differences. If Mr. Weir, you know, the plaintiffs have said they're just going to show. We have to talk about individualized differences as against what there is in common. Isn't that the essence of the thing? Correct. The thing is, is this, is there something here that is sufficiently common that commonality is established, or are there sufficient differences so that it is not predominant? That's what we're concerned with. We're not really concerned with now how much damages there are or anything of that sort. And I want to get back to that point then about whether Judge Weinstein implicitly decided this. And this is critical. In the current record, the record on which this was certified, there is no evidence of a class-wide injury. There is a promise to try to calculate that. There's a dispute on whether or not that can actually be done. And there was a suggestion that maybe our argument is that a judge needs to have the mechanical incantation of I weigh the competing evidence and I favor this, and that shouldn't we implicitly think Judge Weinstein resolved this. But on Special Appendix Pages 125 to 126, Judge Weinstein, it's not a silencer that we're relying on. He explained to us, he said this battle of the experts on price differential is premature. He doesn't have to decide, and he explained why, because he thought that our criticisms of Weir's model just go to injury or, sorry, excuse me, to damages. And battles over damages don't always and don't need to be resolved at the class certification stage. And that's what he says on 126. And our point ‑‑ Isn't that implicitly saying that enough has been shown by this expert to say that there is a common pressure in favor of a higher price and that therefore that commonality is there, but how much is shown or not? I mean, yeah, we can just take Judge Weinstein and what he said, and he said he thought it was premature and he didn't need to resolve it because he viewed this as a fight over damages. Our position here is there's no damages issue. We agree with you that he said that it was premature. Do we send it back by Jacobson remand and say we don't think it's premature, so tell us what you think? No, we don't think, you know, this court needs to because they don't, there's, it's kind of conceded that the evidence wasn't put in the record, right, and that it hasn't been conducted. He hasn't said the evidence is in the record. According to what you just said to us, he said I don't need to decide it because this is enough. So do we say if you have to decide it, is there evidence, or is it up to us to say there isn't enough evidence? I mean, I think you can take that next step because we've shown, and there's no dispute that hedonic regression analysis can fail, and the plaintiff hasn't put forth enough evidence to show it will here. Does it mean the same thing if I instead say it can be impossible to run in the circumstances of a given, to use in the circumstances of a given case? Yeah, that's what I mean here. You could have a situation in which the model succeeds in showing a zero price premium, and that would be a successful model in which we would win on the merits. Our position is the data may be such that you just can't know. And I pointed out the situation where, yeah. Help me understand the record a little bit. One thing that I gleaned from looking at it, that your expert said, well, the data, he hasn't shown that the data even exists to do this. That was one. And then there were other criticisms. Can you marshal those? Right. So on the model itself, you know, a critical aspect is choosing proper and appropriate comparator products and what you're going to measure it against. And he hasn't said what those are, and that gets back to this difference. When you're dealing with eggs, you know, one's organic and one's not. You can imagine that model actually representing what a consumer does. You stand in the supermarket and you see regular eggs and organic, and you see there's a $1 premium. Am I going to pay that? Are you saying then that where a product has no comparator and something is done which, let's assume for purposes, is a misrepresentation, that in a case like that you can never have a class action? We're not. I mean, how do you go about having a class action in a situation where somebody misrepresents and the misrepresentation is something that would make something more desirable? And then you say, but we can't compare because this is something that's new. I mean, we think that it's going to be difficult to do. We don't think the court, though, has to rule it out. We think at this point we have valid criticisms of why this is unlikely to succeed. Dr. Weir says he has workarounds. Why is that at this stage? Why is that important at this stage? Because if the model doesn't provide an answer, there's no class-wide proof of injury. This goes back to the very beginning where you said you agreed with me that we can't be saying that there shouldn't be class action to this. I mean, it goes back to your very beginning. You said we're not going to say that. No, you're not having to say that no expert could ever set forth a persuasive model in which they calculated a price premium. There's no reason to reach that point. Just to go back to my earlier question on Matsui, if they developed a consumer survey, that might be enough data to support the hedonic regression analysis and provide some real analysis of the premium, if any, associated with the flushability. It might be. I think the resistance we've seen here of doing so, I think the survey would almost certainly show individualized preferences and that many consumers don't value that. As we show in the record, our evidence shows 25% of people purchase Freshmates with no intent to flush them. They keep them in their car. They take them on camping trips. They put them in the stroller to take to the playground with their child. They put them in the kitchen. So if you did an individualized survey of how the value, you're going to see a lot of people don't place value on the flushable. The most important aspect of this shows is how effective they are in cleaning. You don't buy something just because of the method of disposal. You like the way it works. And a lot of people like the product to use away from the bathroom. And so if you got into, if you did a survey. Some people you're pointing out may focus on the word moist if it's moist. Right. Flushable if it's flushable. My point is that the survey is going to show individualized issues as to value. Right. And not that everyone puts a premium on it because of flushable. And if 25% of the people or more don't put a premium on it, that's not going to help them show classified injury. Then a merits issue. I mean, so it may be the case that in any consumer survey, some consumers are going to be different. They're going to provide a different answer. Right. And you're telling me that 10, 20% of the consumers may not focus on flushability, but does that undermine the rationale for certifying a class? Yes, because what the Supreme Court said in Walmart versus Dukes is it's not just that the question's common. It's that the answer is common. You've got to be able to answer it yes or no for the entire class. And if some value it and some don't, you can't do that. It has to be an individualized inquiry. At what point can further on, if we were to show that, to say the class then gets limited to those who are paying more? But that would be you would take an individualized inquiry. No, no. I'm just saying if there are two classes of people, those who pay more because they care about flushing and those who don't, doesn't that mean that you then define the class in terms of those who pay more? If there is a common and large group of people who are willing to pay more, isn't that a certifiable class? No, because it would require an individualized. So I think that you're mistaking reliance and causation. I mean, it doesn't really matter why I buy it. If there is a premium associated, some price premium associated with the flushability, regardless of why consumers, if 10 or 20% of the consumers are buying it for another reason, okay, that's their reason. But we are, Procter & Gamble is ascribing some premium to the flushability. And there's a reason why it says flushable on the advertisement. So why isn't that a common issue that cuts across consumers, regardless of their answers to the survey as to why they bought the product? So the survey, I want to do this, the survey is getting at the value that an individual person places on it, which is different than a price premium, which goes by what the retailer sets on that. And that's, which is what they've relied on, right? This is a different type of damage. And why we're not showing reliance, a reliance requirement would say that we would have to be arguing that each purchaser would have to show that they wouldn't have purchased the product, but for the misrepresentation. That's a transaction causation. That's reliance. What we're saying for causation, if you're going to say that the representation caused a price premium, you need a chain of causation that shows how the representation reflected in a higher price premium. If there is a higher price, if there is a higher price, then it doesn't matter whether I bought it because of flushability or not. That's a question of reliance. The question is, have they shown a higher price? That carries into a different issue. I don't know if I get it. And that's becomes the meaning of a flushable. It's our position that if somebody, if the flushability representation was true for somebody, that then they were not injured. Even if there is a price premium, right? If there is a higher price because of that, then hasn't causation been shown. If there is a higher price, haven't you shown a damage even if it, if somebody didn't represent it, then you go back to why McLaughlin is not the key case because that went under unreliance. No, no, your honor. It's the record is clear that even with a price premium, that would just show correlation. It wouldn't show causation. You still need to establish the chain of causation. And in both McLaughlin and in Zyprexa, a price premium had been established, but that wasn't enough to establish causation. You again look to how, you know, some of the key takeaways from the cases is that consumer products, you can't just assume all valuable attributes result in a higher price. We instead need a theory of causation and we need to determine whether common evidence can be used to establish that. In torts generally, cause in fact can never be shown. Actually, it is always circumstantial. Even if I punch you in the nose, I cannot show that it was my punching that broke your nose rather than the almighty chose that moment to break your nose. But the fact that my punching so much increases the chances of your nose being broken that we take it for granted that it was the but for cause the less likely the causal link, the link between punching and breaking the more difficult it is. But you can't tell me that just because it is correlation rather than causation causation isn't shown because that would show no causation ever. So the question is how great is the likelihood that because flush ability is a favorable attribute, there is in fact a higher price. And then the evidence in this record does not. That's what you're saying. There is not enough evidence. And especially when we consider here that this the causal chain to leading to the price premium, probably the most important actor is the retailer who is setting the price. And at this stage, we don't know anything about what factors the retailer takes in the price. We have no basis to say they all act in the same way. And if individual retailers, if some are doing a premium and some are not, some are putting them on sale. When it's on sale, the premium goes away. That's going to affect the price. Individually, you get into a more difficult thing because you are not now showing the question of whether the price was what was there because that's the actual damages. You have to use this to show that there is no common, that there isn't sufficient commonality. And that's what you're trying to argue. Yep. Thank you. Good morning, Your Honor. Less to leave you for Mr. Belfiore. I'd like to address standing and then hedonic regression and then predominant issues in that order. With respect to standing, Mr. Belfiore testified under oath. That he would buy fresh mates. Again, if he had confidence, they would not clog his pipes and sewer systems. That is sufficient to confer standing for injunctive relief. Knowledge that a label was false in the past does not equate to knowledge that will remain false in the future. As the court of appeals held in Davidson against Kimberly Clark, there is standing for injunctive relief. If the consumer is unable to rely on the products label. And so you say that that is enough for us, even though that's not what judge Weinstein went on. Correct. You could affirm on, on that ground that Mr. Belfiore's testimony, there are not similarly situated to Mr. Kurtz in that. Correct. There are three very important reasons why the court should adopt the only court of appeals case dealing with flushable wipes and class actions and Kimberly. And that is that by adopting the Kimberly analysis, you avoid the undermining of the New York consumer protection act. And the ridiculous result is if you know, there's a wrong, you can't do anything to stop it. And the only one who can't stop it is someone who doesn't know about it. So it avoids that adopting Kimberly also avoid the split between the circuit courts. And also you got to look at the real world effect. If you will, that a consumer cannot get injunctive relief in federal court, but can, but can get damage relief. What will happen is that consumers in the future will bring their damage claims in federal court and bring their injunction claims in state court. So you're going to have a multiplicity of cases dealing with some of the same facts, a waste of judicial resources, a waste of the party's resources. And it doesn't do anything for defendants because they'll face the injunctive claims in state court and face the damage claims in federal court. So it undermines CAFA and where Congress wanted to bring class actions into federal court so they could be resolved. So adopting Kimberly has some very beneficial effects with respect to hedonic regression. My opponent stood in the first thing he said on rebuttal is that Mr. Ware should have run his model. And unless he runs his model, you don't know if it's going to work or not. Well, the courts have repeatedly held that the expert does not have to run his model at the class certification stage. He just has to show that the likely method to show class wide damages. And, um, I was looking at McLaughlin on class actions, uh, this morning and it, it says that, uh, under second circuit law, we, we unmistakably require a weighing of different experts, analysis on class action under a preponderance standard, uh, where you have conflicts. And, and I'm focusing on the question of, uh, of canvas analysis, uh, uh, be run in the circumstances of this case, understanding that there were many circumstances in which this type of analysis might be able to establish a price premium. So tell me why the judge here did enough that we know that he resolved that question. Well, what the judge did is he had, um, testimony, uh, he had two days of evidentiary hearings on this case before class certification. He had each expert deliver two reports, their main report and a rebuttal report. So in the rebuttal report, they're rebutting the arguments that they, they each made to each other's reports. Mrs. Scott, who was the procter and Gamble experts main argument is that hedonic research, hedonic regression doesn't work. She doesn't like the whole method. And she's argued that in various federal courts and have lost that. She then argued that she doubts that Mr. Ware can show the difference in, in price, whether it's 2 cents or 50 cents or 60 cents. What judge Weinstein says is that's irrelevant because under the statutory damages in New York, if you show any price difference, whether it's 1 cent or a dollar, you get the statutory damages. So what they took, what his words at a context in their brief, which I point out in our brief, he didn't say that, you know, he doesn't have to decide it. He said, I don't have to decide who's right on the price differential amount because it's irrelevant in this particular case. It was respect to very focused on New York law. And so the unusual nature of the, yes, the statutory damages applies. That's how you distinguish McLaughlin. That's how you distinguish McLaughlin from this situation. McLaughlin is Zyprexa, Your Honor. Is that correct? Zyprexa. That was a reliance case. I think it was a, it was a Rico case or, um, and, uh, the facts really are completely different than as judge Weinstein would know, because he was a district court judge in that case. Um, Procter and Gamble, we've been at this case now for four years. They've never denied. They charge a premium for the flushability attribute. Uh, they have labs set up for flushability testing. They have, I don't have any employees dealing with flushability. They don't really deny it. Uh, and I, in court, they don't really deny it. They don't deny it at all. I mean, they haven't admitted it, but they haven't denied it, which is strange. You would think if they can say there is no price differential, they would say, we don't charge a price differential, but they don't. Um, they do. Can we make something of the fact that they don't deny it? I mean, I would deny if I were them. Yeah. I understand that you would deny it if you were them. But my question is a different one. In terms of class certification, are we allowed to say that here is something that would seem to show a price differential and they never come in and say that it does not, that we sell diet Coke at the same price as regular Coke. Are we allowed on that basis to say there is a commonality or do we require more? Well, that is a factor I think you should consider. There are other factors. They have the burden. They have no burden. We have the burden of showing price differential at the, at the trials, at the trial stage. There's silence. Correct. Correct. It's not fatal. Um, they do have a non-flushable wipe, uh, and a flushable wipe. They charge the flushable wipe. Basically I showed in court 11 cents per, um, per wipe. And the non-flushable, they charge a seven cents per wipe. So they do charge a difference. Um, doctor, we are going to establish a price premium, um, at the wholesale level or the retail level, retail level, retail level. But if they, if probably gamble charges, uh, the, their retailers, a premium that'll get passed on class wide to the consumers because retail pricing is based on a markup to cost. So class wide, they charge the middleman a higher price. The middleman's going to pass it on to the consumers. That's basic retail economics. With respect to hedonic regression, um, Judge Pauly, nine days ago, uh, rejected criticism of Colin Ware's, um, analysis. Uh, even though he did not have hard data from retailers, he used the data from wholesalers. And Judge Pauly said that was enough. And 10 days ago, Judge Brody certified a consumer class action, approving hedonic regression analysis. Um, so, and said, you don't have to. The data that Dr. Weir will use is, is a wholesale data to establish the retail. He'll use every piece of data he can get his hands on, Your Honor. And if he has retail analysis, he'll use that. He has been deposed. I don't believe he was. He hasn't been deposed. No. And he certainly didn't testify before the judge. Mr. Weir didn't. No, no. But as I said, many courts, almost every court I know of, uh, has said that,  the criticisms of Mr.  whether he's done enough or can't, he's done enough, is for cross-examination at trial. Um, and as was pointed out. Maybe, and help me with this. That may be true in many, in many cases. Uh, but in this case where we're trying to assess predominance, it's the ability to establish a, a, a price premium that, that allows us to say, according to your theory, they can establish injury on a class-wide basis, and they can establish causation on a, a class-wide basis. So two elements. So doesn't that make, in this case, uh, the concerns about the expert that much more salient? Well, that would be true, I think, in any consumer class action. Um. It's based on a, a price premium. Yes. Price premium. Which most of them are, a lot of them are. Um, and again, if, if he fails, he fails class-wide. So for a class-wide issue, you meet, you meet Rule 23 requirements. There can never be, you're saying, a class action in which there aren't some people, uh, who, due to a misrepresentation, might be willing to pay more for that, and some others might be willing to pay more, but not as much more. But that doesn't mean that, uh, commonality, uh, doesn't predominate over the difference. Correct. Injury occurs at the cash register. It doesn't occur afterwards. And courts have held, it doesn't matter why you buy the product. If you're paying more for the product than you should have paid, because of this misrepresentation, then you've been injured, class-wide. Will you, will you address the injunction in standing? Um. You addressed the injunction in standing. I thought I did. But I, I do want to ask you this. So my understanding, and this is what I was looking for, is that, uh, Mr. Belfiore testified that if he had confidence, that Procter & Gamble's fresh mates would flush without clogging his septic system, and so on, he would buy the product again in the future. Correct. Yes. Is that enough? Is that enough under Nicosia, even? Yes, uh. Why is that enough? Well, it's not enough. If he had confidence, but he doesn't say he has confidence. Correct. If you can't rely on the label anymore, as the Ninth Circuit ruled, then you're damaged. In Nicosia, the key thing is he could never be damaged, because the product was off the market, and he said affirmatively, I'm not going to buy that product, or any product. But in effect, isn't he saying, look, I don't have confidence in this. But he says, if I had confidence. Right. But does he have confidence? No. He wants to buy a flushable product. And he. He's eager. He's out there. Yes. He wanted to buy a flushable. He would love to buy it, as long as it didn't clog his system. He bought fresh mates, it clogged his system, so he's saying, I'm not going to buy it again, unless I have confidence it won't clog my system. But I do want to buy a flushable one. That's enough. That's enough to say a damage to him, for article 3 standing. Correct. And I said, if you go the other way, you've got some very bad effects. You just mean that you could never enjoin, because until you know that there's something wrong, you have nothing to claim. Correct. That's the catch-22 that they're relying on. The final on predominant issues. Procter and Gamble not only lost the class motion on fresh mates before Judge Weinstein, they lost it in California in the Pettit case. After they lost that, which was for a California class, they expanded that case to cover 49 states, every state but New York. And then they settled that case, went to the federal court, and told the federal court, they've met rule 23, because under the AIG decision by this court, in order for a federal court to allow a settlement class to have to have done an analysis, that rule 23 has been met. And so in that case, they didn't argue that common issues don't predominate. They didn't argue you couldn't show damages class-wide. They didn't argue you couldn't show injury class-wide or causation class-wide. They asked the court to certify a 49-state class action settlement on flushable wipes, and the court did so. Thank you. Okay. Thank you. I'll start where we ended up there, and obviously I think the court's well aware that a settlement is not an admission of guilt. And one key and critical distinction, I think maybe harping on more, is there in the California case, the plaintiffs did the work. Their expert constructed a model, ran the model, and showed, he thought, a price premium. We disagreed. We thought the model itself was flawed. But they did the work. That makes it much different than here. They did a consumer survey of what consumers in California think flushable means. Again, we challenged it. We thought it was a flawed survey. But the district court there had evidence before it, and it was weighing whether the evidence they put forward was sufficient. And we thought it wasn't. When the court certified it, what happens is what you see when a class is certified. It often leads to settlement. Here they're trying to keep a class certified without even doing that work, without even putting forward the model. So on standing, if anyone was going to have standing, it's hard to see that it's Mr. Belfiore who purchased Freshmates one time, February 2014, more than five years ago. And what he testified to is that he would purchase a product that he thought was flushable. So he would purchase a different product. That's not what the standing issue goes to. He's seeking an injunction that would change the label. And what the Ninth Circuit said in Davidson, which was decided on a motion to dismiss, the plaintiff there had alleged that she would continue purchasing the product if the label was fixed. Because that's what the injunction is really going at, is correcting misrepresentations on the label. That's much different than saying, I would purchase a different product. To the question I asked in the previous case where I said, Kurtz clearly had not. Belfiore was more doubtful, which is really what we're talking about. Shouldn't, if what you say is true, Belfiore be allowed to amend and say what you are now saying would be necessary and what was done in the other? Because at this point he had no reason to do it. It's not inconsistent with what he said, but he had no reason to do it because Judge Weinstein, according to you, and I think incorrectly said there was standing because of this generic New York, but that he could amend perhaps and say what you have said was enough in California. I don't think he could amend and be consistent with his testimony under oath, which he never said. He was locked in. I think he should be. And to finish this point of why didn't Procter and Gamble make, deny that there is an overpricing claim? Why haven't they put forth? Beyond the point of burden of proof, what we have said is that the retail price, which is what's relevant here, is set at the sole discretion of the retailer. They suggested maybe we charge a higher price for wholesale. No evidence in the record of that. They took discovery on that. They haven't even tried to show that. So what we have denied is that we set the retail price, and they need to show that, and that's their burden, and they failed to do so. Thank you. Thank you both. Very well argued. We'll take it under advisement.